[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION AND JUDGMENT
The Commissioner of Environmental Protection (the Commissioner) seeks a permanent injunction and the imposition of fines against the defendants Buell's Greenhouse, Inc. and Albert Buell based on allegations that the defendants disposed of waste oil contaminated with polychlorinated biphenyls or terphenyls ("PCB") without a permit from the Commissioner and failure to comply with the provisions of a final, unappealed administrative order to abate pollution.
The court finds the following facts. The defendant Buell's Greenhouse, Inc. (the "Company") has operated a greenhouse where it raises African violets, hybridized gloxcinias and related house plants since the late 1940's. It is a small company, which is wholly owned by the defendant Albert Buell and his wife and operated by them with four other employees. Albert Buell is the president of Buell's Greenhouse, Inc. and owns the land on which the greenhouse business is located.
In order to heat its greenhouse in the cold weather the Company has burned waste oil and commercial oil for hot water heat in furnaces.
Sometime prior to 1982 Albert Buell collected waste oil for the Company which oil contained a small concentration of PCB's. This oil was put in the Company's oil tanks at the greenhouse in Eastford. In November of 1982 the Department of Environmental CT Page 10171 Protection (DEP) took fourteen samples of waste oil located on the defendants' premises. All samples revealed the presence of small concentrations of PCB's. However, only two of the samples contained PCB's in concentrations of greater than 50 parts per million ("ppm"). Oil with a PCB concentration of greater than 50 ppm must be burned in incinerators approved pursuant to the Toxic Substance Control Act (TOSCA).
As a result of the finding of PCB's on the defendants' premises the Commissioner commenced an action against Buell's Greenhouses, Inc., in 1983. In a stipulated judgment in that action the Company agreed to comply with all applicable state statutes and regulations regarding hazardous waste management.
The DEP again inspected the defendants' premises in July, 1988. This inspection revealed that waste oil containing PCB's was still present in oil tanks on the premises. One of these tanks, which was in or adjacent to a lagoon area, had ruptured and oil was seeping into the lagoon. A sample from the lagoon area revealed the presence of a small concentration of PCB's.
By Order dated September 1, 1988 the Commissioner ordered the Company to take steps necessary to 1) effect the removal and proper disposition of the PCB-laden material, 2) implement a management plan for marking, handling and disposition of PCB items, 3) investigate the degree of PCB contamination on the premises and 4) take remedial actions to eliminate or minimize PCB contamination. The Company did not comply with the Order.
On various dates between 1988 and 1992 DEP employees inspected the defendants' premises and took samples of oil contained in storage tanks. Analyses of the samples revealed the presence of PCB's in the oil.
During the period from 1988 to 1992 several DEP employees informed Albert Buell that he would have to arrange for disposition of the PCB contaminated oil in a manner approved by the DEP. They informed him that PCB's could be eliminated through burning the oil only in certain incinerators which burned at extremely high temperatures.
Albert Buell contacted two companies concerning proper disposal of the contaminated oil and the tanks in which it was stored. He determined that the cost of disposal was too high. Thereafter he disposed of the contaminated oil by burning it CT Page 10172 himself and cut up one or more of the tanks in which the oil had been stored and sold the tank pieces as scrap. The defendants' furnace did not burn at a temperature which was high enough to eliminate the PCB's.
At trial, the parties stipulated that the cost to properly dispose of the contaminated oil and storage tanks was $50,000 — $75,000.
Burning PCB contaminated waste oil at temperatures lower than those sufficient to eliminate the PCB's results in carcinogenic by-products being released into the environment, creating risks to people and wildlife. The groundwater flowing under the defendants' premises is classified as "GAA," the highest possible classification. Such water is intended to be available for public water supplies without any treatment. The plaintiff has presented no evidence of contamination of any public water supply or private well.
The Company employs Albert Buell and his wife who are both over 75 years of age, and four other employees. Both Albert Buell and his wife have been putting their salary and savings back into the Company so that the Company could continue to operate. The Company has not shown a profit for several years.
Connecticut General Statutes 22a-467 provides that "[n]o person or municipality shall dispose of the compound PCB or any item, product or material containing the compound PCB by any means other than a means approved by the commissioner which will result in the destruction of the compound PCB except in accordance with a permit issued by the Commissioner under the provisions of Section 22a-208, 22a-208a, 22a-430 or 22a-454." The defendants violated that statute when they disposed of the contaminated oil by burning and by cutting up and selling the contaminated oil tank without a permit from the Commissioner.
The plaintiff is seeking an injunction pursuant to 22a-435
of the Connecticut General Statutes which provides:
 If any person or municipality fails to comply with any order to abate pollution, or any part thereof, issued pursuant to the provisions of section 22a-428, 22a-431 or 22a-433 . . . the commissioner may request the attorney general to bring an action in the superior court for CT Page 10173 the judicial district of Hartford-New Britain to enjoin such person or municipality from maintaining such pollution and to comply fully with such order or any part thereof.
That statute has been interpreted to require the issuance of an injunction if the Commissioner proves that the defendant has failed to comply with an order to abate pollution. Connecticut Water Co. v. Beausoleil, 204 Conn. 38, 45,526 A.2d 1329 (1987).
The Commissioner has proved and the defendants have admitted, that they did not comply with the order to abate pollution. Therefore, an injunction may issue against the defendants.
The Commissioner also seeks civil penalties against the defendants. Connecticut General Statutes 22a-469 provides that penalties for violations of the PCB statutes "shall be subject to the penalties provided for in section 22a-438." Connecticut General Statutes Section 438 provides for a "civil penalty not to exceed twenty-five thousand dollars, to be fixed by the court, for each offense" which violates Chapter 446K of the Connecticut General Statutes or Sections 22a-6 or 22a-7.
Albert Buell claims that he should not be held liable for actions he took in his position as an employee and president of Buell's Greenhouse, Inc. However, Albert Buell is the owner of the land on which the Company operates. Section 22a-433 of the Connecticut General Statutes provides for joint and several liability of the owner and the nonowner of land from which a source of pollution emanates when an order to abate pollution on the land has been issued. As an owner of the land Albert Buell is jointly and severally liable with Buell's Greenhouse, Inc. for the failure to obey the order to abate pollution.
In Carothers v. Capozziello, 215 Conn. 82, 103-104,574 A.2d 1268 (1990), the Court set forth factors to be considered in levying a civil penalty for environmental violations: Those factors include, but are not limited to: (1) the size of the business involved; (2) the effect of the penalty or injunctive relief on its ability to continue operation; (3) the gravity of the violation; (4) the good faith efforts made by the business to comply with applicable statutory requirements; (5) any economic benefit gained by the violations; (6) deterrence of CT Page 10174 future violations; and (7) the fair and equitable treatment of the regulated community.
Section 22a-438 sets forth certain factors to be considered in determining the amount of civil penalties in water pollution cases. These factors are "the nature, circumstances, extent and gravity of the violation, the person or municipality's prior history of violations, the economic benefit resulting to the person or municipality from the violation, and such other factors deemed appropriate by the court."
In this case the court has considered the following factors in arriving at the amount of civil penalty to be imposed on the defendants. The defendants' business is very small and is operated by two people, Albert Buell and his wife, who are over 75 years of age. The business has been operated at a loss for the last several years. The defendants saved $50,000 — $75,000 by their failure to properly dispose of PCB contaminated materials.
The amount that a defendant has saved by not complying with the environmental protection laws is significant because it is a quantifiable amount which has a clear relationship to the defendant's conduct. Thus, in many cases the amount of economic benefit gained by failing to follow the environmental protection statutes could serve to establish the minimum amount of a civil penalty. However, both Carothers v. Capozziello, supra, and22a-438 require the court to consider factors other than economic benefit to the defendant in assessing a civil penalty, including the size of the business involved and the effect of the penalty on a defendant's ability to continue operations.
The defendant in this case gained an economic benefit by improperly disposing of contaminated materials. However, the improper disposal was occasioned by the defendants' lack of funds with which to pay for proper disposal, rather than their desire to evade the effects of the environmental protection laws. It is probable that payment of a penalty in the amount requested by the plaintiff, $125,000. or even in the amount of $50,000, minimum cost of proper disposal, would result in the termination of the defendants' business.
While the defendants clearly did not comply with the DEP order, there is no evidence that the water supply has been affected by the PCB contaminated oil. The defendants have not CT Page 10175 collected PCB contaminated oil for seven years. Therefore, they have stopped the practice which created the environmental problem.
Based on the foregoing it is hereby ORDERED:
A. Defendants Albert Buell and Buell's Greenhouse, Inc., and their agents officers and employees, are each commanded and enjoined to wholly and absolutely desist and refrain from the following conduct at any point subsequent to entry of this judgment: (1) To wholly and absolutely desist and refrain from discharging any water, substance or materials into the waters of the State of Connecticut without first obtaining the permit from the Commissioner of Environmental Protection required by Conn. Gen. Stat. 22a-430; and, (2) To wholly and absolutely desist and refrain from disposal of any material of any sort contaminated by PCB without first obtaining the permission from the Commissioner of Environmental Protection required by Conn. Gen. Stat. 22a-467.
B. Defendants Albert Buell and Buell's Greenhouse, Inc., and their agents, servants and employees, are each commanded as follows: (1) On or before January 30, 1993 verify, in writing, to the Commissioner of Environmental Protection that a qualified environmental consultant has been retained to perform the steps required in this Judgment; (2) On or before April 30, 1993, submit to the Commissioner of Environmental Protection, in writing, for review and approval, a detailed report that outlines a sampling program including sampling locations, techniques, and the analytical test to be performed to determine the degree and extent of on-site PCB soil, surface water and groundwater contamination; (3) On or before June 30, 1993, submit to the Commissioner of Environmental Protection, in writing the final report and analytical results obtained in accordance with the report identified in #B(2) above, including an implementation schedule for the removal of contaminated soils, recommendations on the need for a surface water and groundwater monitoring program to further define the degree and extent of PCB contamination, and recommendations on the steps needed to remediate any soil, surface water or groundwater contamination identified, along with an implementation schedule; (4) On or before August 30, 1993, verify to the Commissioner of Environmental Protection, in writing, that the remedial actions approved in the report submitted under #B(3) above have been implemented; (5) On or before September 30, 1993, verify to the CT Page 10176 commissioner of Environmental Protection, in writing, that monitoring wells have been installed as approved under #B(4) above, that the proposed surface water and groundwater sampling program has begun, and that steps to remediate surface water and groundwater contamination, as approved under #B(4) above have been implemented; and (6) Continue steps to remediate surface water and groundwater contamination if any such contamination has been found in accordance with the implementation schedule approved by the Commissioner of Environmental Protection until the contamination is eliminated.
C. The injunctive provisions of ##A and B of this Judgment are entered under the penal sum of $500 per day per violation.
D. Defendants Albert Buell and Buell's Greenhouse, Inc. are ordered to pay to the State of Connecticut, in accordance with Conn. Gen. Stat 22a-438, a civil penalty in the total sum of $15,000. Defendants Albert Buell and Buell's Greenhouse, Inc. shall be jointly and severally liable for the civil penalty assessed herein.
E. Costs are taxed against defendants Albert Buell and Buell's Greenhouse, Inc., jointly and severally, in the amount of $ ___________, in accordance with the Bill of Costs filed by the plaintiff.
BY THE COURT
Aurigemma, J.